IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| POWER BLOCK COIN, L.L.C., a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ZHOUYANG SONG, an individual,<br><br>Defendant. | **ORDER AND MEMORANDUM DECISION DENYING IN PART PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS AND DENYING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:23-cv-00175-TC-JCB<br><br>Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Before the court are a motion to dismiss the Defendant's counterclaims filed by Plaintiff Power Block Coin, L.L.C. d/b/a SmartFi (SmartFi) and a motion for preliminary injunction filed by Defendant Zhouyang Song.[1]  The court held a hearing on these motions on June 7, 2023.  As counsel noted at the hearing, the matter presents novel issues involving cryptocurrency lending. For the reasons stated below, the court denies both motions, with the exception that the court grants the motion to dismiss the Defendant's counterclaim for fraud.

## BACKGROUND

Defendant Song is a Bitcoin miner.  (Decl. Zhouyang Song, ECF No. 16-1 at ¶ 3.)  To generate funding for his mining operations without paying taxes on the capital gains he would realize were he to convert Bitcoin to U.S. dollars, Mr. Song regularly takes out loans using his Bitcoin as collateral.  (Id.)  Because Bitcoin has a volatile market price, these loans are highly

---

[1] Mr. Song uses the first name Mason in communications with SmartFi that the court references below.

collateralized, which means that Mr. Song secures his loans with Bitcoin in an amount that is worth more than the U.S. dollars he receives in return. (Pl.'s Reply, ECF No. 19 at 6 ("[A] high collateral-to-loan value is necessary where the bargained-for Collateral [is] a highly volatile asset like Bitcoin.").)[2]

At issue in this lawsuit is a loan from Plaintiff SmartFi, a cryptocurrency exchange and trading platform, that Mr. Song took out on January 2, 2023, which is memorialized with both a Loan Agreement (the Agreement) and a Secured Promissory Note (the Note).[3] (Compl., Ex. 1, ECF No. 2-1 at 9–31; Def.'s Mot. Prelim. Inj., Ex. A, ECF No. 16-2.) Under the terms of the Agreement and Note, SmartFi loaned Mr. Song $4,378,094.40 at a rate of 8% annual interest. (ECF No. 2-1 at 9, 19; ECF No. 16-2 at 2, 12.)[4] The loan had a loan-to-value (LTV) ratio of 65%, meaning that "[t]he value of the Collateral required to be maintained hereunder (the "Required Collateral Value") is determined by dividing the outstanding balance by 0.65." (ECF No. 2-1 at 19; ECF No. 16-2 at 12.)[5] In other words, Mr. Song was required to secure his loan with collateral in the form of Bitcoin that was worth the Required Collateral Value, or

---

[2] For ease of reference, ECF citations are to PDF pages rather than internal document pages.

[3] The parties have only provided the Loan Agreement and Secured Promissory Note for the loan that is the subject of the parties' dispute. But for the purposes of these motions, the court assumes that previous loans between the parties were memorialized with loan agreements and secured promissory notes containing similar terms (other than the specific values for the loan amount, interest, and required collateral).

[4] See also Telegram Messages between Meecham and Song, Def.'s Reply, Ex. E, ECF No. 25-3 at 11 (message from Dustin Meecham at SmartFi to Mr. Song stating: "Hi Mason, yes the finance team has refinanced and rolled over your loan for 1 month 65% LTV [loan-to-value] at 8% as requested"). At an annual interest rate of 8%, Mr. Song was required to pay interest of $29,313.77 for the one-month loan, an amount that was "added to the outstanding balance of the Loan upon the issuance of the Note." ECF No. 2-1 at 9; ECF No. 16-2 at 2.

[5] The higher the LTV, the higher the interest rate on the loan, as a higher LTV means that the lender will hold less collateral as security. See, e.g., Telegram Messages between SmartFi and Song, ECF No. 25-2 at 5 ("[I] added a 60% LTV with the 13.5% what [sic] is the middle between 70% (15%) and 50% (12%) so its [sic] the same but another option[.]"); id. at 14 ("[W]ould you like to roll over 1 month at 70% LTV at 14%, or 60% LTV at 13%?").

$6,780,627.95.  (ECF No. 2-1 at 20; ECF No. 16-2 at 13.)

There is some confusion about how much Bitcoin was necessary to achieve the Required Collateral Value.  The parties submitted two different versions of the Note.  In the Plaintiff's version, the Note was secured by "405.41870000 BTC," or about 405 Bitcoin.  (ECF No. 2-1 at 19.)  In the Defendant's version, the Note was secured by "433.9274 BTC," or about 434 Bitcoin.  (ECF No. 16-2 at 12.)[6]  SmartFi asserts that the error is meaningless, as both parties acknowledged at the hearing that 434 Bitcoin was the correct amount of Mr. Song's collateral that was in SmartFi's possession on January 2, 2023.  But the court finds the error illuminating, as the smaller amount, 405 Bitcoin, was the correct amount of collateral necessary to provide the Required Collateral Value of $6,780,627.95 on January 2, 2023, when Bitcoin was trading around $16,725.[7]  It therefore appears that—on the date the loan was issued—SmartFi had around 29 more of Mr. Song's Bitcoin than was required as collateral under the terms of the Note.

One source of the confusion about the collateral is that the loan at issue in this lawsuit was not new, but rather a loan that had been refinanced and rolled over from a previous loan.  Indeed, counsel stated at the hearing that Mr. Song and SmartFi had a relationship for over three

---

[6] Neither version of the Note submitted to the court was signed by Mr. Song.

[7] The Note reads: "The value of the Collateral measured at any given time is the product of the Collateral held by Lender multiplied by the USD current market price ("Current Collateral Value"), as determined in Lender's reasonable discretion.  On the issuance date of this Note the Required Collateral Value is $6,780,627.95."  (ECF No. 2-1 at 19–20; ECF No. 16-2 at 12–13.)  According to the Chicago Mercantile Exchange (CME), the high value of Bitcoin on January 2, 2023, was $16,725.  Dividing the Required Collateral Value ($6,780,627.95) by the trading price ($16,725) yields 405.4187 Bitcoin, which is the amount of Bitcoin cited as collateral in the version of the Note provided by the Plaintiff in its complaint.  ECF No. 2-1 at 19.  The court uses the CME index for Bitcoin futures because it is the source cited by SmartFi during a dispute about the price of Bitcoin between SmartFi and Mr. Song.  See ECF No. 25-2 at 32 (explaining why the price of Bitcoin had dropped low enough to issue a margin call and stating that "[t]he above chart is the CME and is biggest financial market in the world").  The price of Bitcoin on other exchanges is sufficiently similar for the court to rely on CME prices for the purposes of this order.

years and that Mr. Song took out or rolled over around 30 loans during that time.  Mr. Song

provided evidence of this relationship through a series of messages over Telegram between Mr.

Song and members of the SmartFi team, including Dustin Meecham, whom Mr. Song states was

his main contact and link to SmartFi's finance department.  (Screenshots of Telegram Messages,

Def.'s Mot. Prelim. Inj., Ex. B, ECF No. 16-3 at 7; ECF No. 25-2; ECF No. 25-3.)  SmartFi often

refinanced Mr. Song's loans when he rolled them over, as Mr. Song sometimes paid off part of a

loan or sought other terms of interest, maturity date, or LTV ratio.  (See, e.g., ECF No. 25-2 at

16 ("Thanks Mason, I will inform the finance team of your request to refinance and roll over

loan #10391 with payoff of $460,523.07 into a new loan for 1 month term, 70% LTV, at current

rate of 14%.  The finance team will adjust the BTC collateral from your wallet with the current

market rate and book."))  The court finds that whether SmartFi should have adjusted Mr. Song's

collateral and returned 29 Bitcoin when it refinanced the loan at issue is an open question.

The messages also demonstrate that, shortly after turmoil in the markets caused by the

collapse of the FTX trading platform, SmartFi requested additional collateral from Mr. Song

(ECF No. 25-2 at 24–33) under a provision of the Note that allowed SmartFi to issue a margin

call if the value of collateral dropped:

> Borrower covenants and agrees that if at any time the Current Collateral Value
> drops below 77.5% of the Required Collateral Value, then Lender shall have the
> right to cause Borrower to deliver to Lender sufficient U.S. Dollars or additional
> BTC necessary to raise the Current Collateral Value to at least the Required
> Collateral Value.

(ECF No. 2-1 at 20; ECF No. 16-2 at 13.)  Mr. Song disagreed that the market price of Bitcoin

hit a value low enough to activate this provision (see ECF No. 25-2 at 32 ("The fact is price

never hit margin call")), but on November 10, 2022, Mr. Song did send an extra 57 Bitcoin to

SmartFi to settle the margin call. (Id. at 33 ("57 btc sent").)[8]

The Note also contained a mirror provision that allowed Mr. Song to receive excess collateral if, conversely, the price of Bitcoin rose sufficiently:

> Lender covenants and agrees that if at any time the product of the quantity of Collateral held by Lender multiplied by the closing average of the past 14 days is greater than 122.5% of the Required Collateral Value, then Borrower shall have the right to cause Lender to deliver to Borrower sufficient account credit in BTC necessary to lower the value of the Collateral to the Required Collateral Value.

(ECF No. 2-1 at 20; ECF No. 16-2 at 13.) In other words, the contract allowed the amount of collateral to be adjusted during the term of the Note if either the price of Bitcoin dropped too low (in which case SmartFi could issue a margin call and ask for additional collateral) or if the price rose too high (in which case Mr. Song could demand the return of excess collateral).

The Note specified that an "Event of Default" included when the "Borrower fails to pay any payment required under the terms of this Note or any other Loan Document on the date such payment is due." (ECF No. 2-1 at 20; ECF No. 16-2 at 13.) The Note further stated: "Upon the occurrence or existence of any Event of Default … and at any time thereafter during the continuance of such Event of Default, Lender may … declare the entire remaining unpaid balance owing under this Note to be immediately due and payable…." (ECF No. 2-1 at 21; ECF No. 16-2 at 14.) "Further … Lender may immediately sell the Collateral." (Id.) Finally, the Note contained the following provision:

> In the event Borrower fails to repay the Note by the Maturity Date, Lender may: (i) if the current collateral value of the loan on the Maturity Date is sufficient to collateralize a new loan in the amount equal to the outstanding balance of the mature loan, Lender may provide a new loan on behalf of Borrower in the amount

[8] Earlier that day, Mr. Song had already paid off one loan and sent an additional 11 Bitcoin to SmartFi as a result of the margin call. ECF No. 25-2 at 27–28. He was frustrated because he felt that the price of Bitcoin had not dropped to $15,530. Id. at 32. But regardless of the correct valuation of Bitcoin, even Mr. Song admits that the price was at least as low as $15,588. Id. at 29. And SmartFi had the right to initiate a margin call at $15,750 (and informed Mr. Song of that price, see id. at 24); SmartFi simply chose not to initiate the call until the price dropped to $15,530. Id. at 27.

of the outstanding balance of the mature loan, and use the proceeds from the new loan to pay off the mature loan; or (ii) if the current collateral value of a loan at Maturity Date is insufficient to collateralize a new loan, Lender may elect to declare an Event of Default.

(Id.)

The loan amount owed under the Note was due one month from the January 2, 2023 issuance date, on February 2, 2023 (the Maturity Date).  (See ECF No. 2-1 at 19; ECF No. 16-2 at 12.)  But SmartFi had previously refinanced and rolled over Mr. Song's loans shortly before the due date, sometimes reaching out to Mr. Song for instructions on the day before the loan came due (see, e.g., ECF No. 25-2 at 14 ("[W]e are following up on loan we rolled over last month … due tomorrow …."); id. at 16 ("Hi Mason, loan #10391 that we refinanced and rolled over for one month … is coming due tomorrow, Oct 22, and we are following up with you on what you would like to do with this loan.")) or even on the day the loan was due (see id. at 19 ("Hi Mason, the finance team is just following up to see if you still plan on paying off and closing your loan #10381 today of $1.4 mil so that they can know if they will need to return your BTC collateral to your wallet today or if it will get paid off later in the week.")).

During discussions about the loan at issue, Mr. Song alleges that, on January 16, 2023, the parties agreed that Mr. Song would transfer $1 million in U.S. dollars to SmartFi and, in exchange, SmartFi would roll over the remaining balance of the loan into a new one-month loan. (Counterclaim, ECF No. 5 at ¶ 3.)  Mr. Song suggested this exchange as follows: "Hi Dustin, on February 1st I'll pay 1M back to you, and roll the rest loan for 1 [month].  since redo the loan, I guess I can get some btc back this time."  (ECF No. 25-3 at 12.)  Mr. Meecham responded: "Hi Mason, thanks for letting us know in advance.  I will inform the finance team of your request and we can coordinate loan details closer to due date with market pricing and payment adjustments."  (Id.)  Mr. Song later stated that he would send the money via wire transfer and received the

requisite bank details from Mr. Meecham.  (Id. at 13.)

On January 30, 2023, Mr. Song wired the $1 million payment to SmartFi, leaving a $3.4 million outstanding balance on the loan.  (See ECF No. 25-2 at 38.)  After receiving the wire, Mr. Meecham wrote Mr. Song the following message: "Hi Mason, the finance team has credited the wired money to your wallet.  They have also informed me that we will not be refinancing and rolling over loans currently and all loans will need to be paid off in full when due." (ECF No. 25-2 at 39.)  Mr. Song responded with surprise ("you telling me 1 days before the due date to pay off 4.4M loan?")[9] and asked SmartFi to call him.  (Id.)  Mr. Song also instructed Mr. Meecham as follows: "hey dustin, so i hv 1M there and plz sell btc for the rest of the loan and pay me back the rest … around 147 btc will be enough to cover my loan and i hv around 286 btc to be paid back."  (ECF No. 25-3 at 14.)  Mr. Meecham responded by telling Mr. Song to discuss the details with Aaron Tilton, the head of SmartFi: "[E]verything is going through Aaron right now for final clarifications.  Michelle [i.e., Michelle Ray, another employee at SmartFi] also said Aaron is away and not available probably until tomorrow."  (Id. at 15.)

It appears that Mr. Song and Mr. Tilton had a phone conversation around 5:00pm the following day, on the afternoon of January 31, 2023, although there is no record of what was discussed.  (See ECF No. 16-3 at 3; ECF No. 25-2 at 39.)  Mr. Song asserts that he instructed Mr. Tilton to sell a portion of his Bitcoin collateral to repay the loan (Song Decl. ¶ 10, ECF No. 16-1 at 3) but wanted to wait two or three days until after a Federal Reserve meeting (ECF No. 16-3 at 3) and that Mr. Tilton said that was "fine."  (Id.)

_____

[9] In his Counterclaim, Mr. Song states that "SmartFi reneged on its agreement to rollover the loan on January 31, 2023."  (ECF No. 5 at ¶ 4.)  But the relevant messages suggest that these events occurred on January 30, 2023.  (ECF No. 25-2 at 37–39; ECF No. 25-3 at 13–14.)  In any event, the loan was due on February 2, 2023.

Mr. Tilton messaged Mr. Song on February 1, 2023, as follows: "The team is reviewing the contract to see what our options are.  We will be in touch with you tomorrow afternoon. Anything that happens will happen Friday."  (ECF No. 25-2 at 39.)  Friday was February 3, 2023, one day after Mr. Song's loan was due.  Mr. Song responded: "what do you mean options? i thought we agreed yesterday on the phone on selling btc for the loan either tmr or friday."  (Id.) There is no evidence of further messages from SmartFi.  Instead, Mr. Song received an email on February 2, 2023, titled "Notice of Event of Default" that stated: "This email communication is to inform you that your failure to pay constitutes an Event of Default under Section 6 of the Secured Promissory Note attached as Exhibit A to your current loan agreement dated January 2, 2023.  This matter has been referred to legal counsel."  (ECF No. 16-3 at 5.)  Mr. Song states that on February 3, 2023, he attempted to withdraw the $1 million in cash that he had deposited a few days earlier, but the request was rejected.  (Id. at 6; Song Decl. ¶ 15, ECF No. 16-1 at 3.)

Mr. Song alleges that, through discussions between counsel on February 15, 2023, he offered to repay the outstanding loan balance if SmartFi was willing to provide assurances that it would return his collateral in the form of an escrow account or similar arrangement.  (Decl. Nicholas O. Kennedy, ECF No. 16-5 at ¶ 3.)  On February 17, 2023, SmartFi filed this action in state district court, alleging breach of contract and unjust enrichment.  (Compl., ECF No. 2-1.) Mr. Song removed the action to federal court on March 10, 2023 (Notice of Removal, ECF No. 2), and counterclaimed for breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, fraud, conversion, equitable recoupment and setoff, and trespass to chattel (ECF No. 5).

SmartFi then moved to dismiss the Defendant's counterclaims (ECF No. 11).  On May 8, 2023, Mr. Song moved for a preliminary injunction (ECF No. 16).  The court now turns

to these motions.

## LEGAL STANDARDS

### A. Motion to Dismiss Counterclaims

Dismissal of counterclaims is appropriate under Federal Rule of Civil Procedure 12(b)(6)

if a pleading fails to state a claim upon which relief can be granted. The court must accept all

well-pled factual allegations as true and construe them in the light most favorable to the

nonmoving party. Strauss v. Angie's List, Inc., 951 F.3d 1263, 1267 (10th Cir. 2020). But that

rule does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).

"[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action'

will not suffice; a plaintiff must offer specific factual allegations to support each claim." Kan.

Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007)). "[T]o withstand a motion to dismiss, a [pleading] must

have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its

face.'" Id. (quoting Twombly, 550 U.S. at 570).

### B. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc.,

555 U.S. 7, 22 (2008). The moving party must establish: "(1) that it has a substantial likelihood

of prevailing on the merits; (2) that it will suffer irreparable injury if the injunction is denied;

(3) that the threatened injury to the movant outweighs the injury that the opposing party will

suffer under the injunction; and (4) that the injunction would not be adverse to the public

interest." Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1065–66 (10th Cir. 2001).

A party seeking a preliminary injunction must prove that all four of the equitable factors weigh

in its favor.  <u>Sierra Club, Inc. v. Bostick</u>, 539 F. App'x 885, 888 (10th Cir. 2013).

Certain types of injunctions are disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  <u>O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).  When the court rules on a disfavored injunction, the preliminary injunction factors "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."  <u>Id.</u>

## ANALYSIS

To begin, the court notes that the issues in this action raise several novel questions of law and that the parties have cited the court to few cases on point.  Other types of secured transactions, such as those involving real property or stocks, are heavily regulated.  For instance, "regulations provide that margin excess—securities or cash held in a margin account that exceed collateral requirements—can be taken out of a margin account."  <u>United Food & Com. Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.</u>, 774 F.3d 1229, 1240 (10th Cir. 2014) (citing 12 C.F.R. §§ 220.4(e)(1)–(2)).  Here, there are no regulations of which the court is aware that provide similar background rules for the treatment of cryptocurrency collateral.  Instead, the court relies on the contract agreed upon by the parties and traditional tools of contract interpretation.

### A.  Motion to Dismiss Counterclaims

SmartFi moves to dismiss Mr. Song's counterclaims for breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, fraud, conversion, equitable recoupment and setoff, and trespass.  For the following reasons, the court denies

SmartFi's motion—with the exception of Mr. Song's claim for fraud, which the court dismisses.

### 1. Breach of Contract

Under Utah law, the elements of a breach of contract claim are "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." Haynes v. Dep't of Pub. Safety, 460 P.3d 565, 567 (Utah Ct. App. 2020) (quoting Am. W. Bank Members, L.C. v. State, 342 P.3d 224, 230–31 (Utah 2014)).

Mr. Song alleges that he performed under the Agreement by transferring the required collateral under the Note and that SmartFi breached the Agreement and Note for two reasons. First, Mr. Song maintains that the Agreement required SmartFi to either 1) roll over the outstanding balance into a new loan as it had done before; or 2) sell off enough collateral to pay the loan balance and return the remaining collateral. Mr. Song refers to Section 6(g) of the Note:

> In the event Borrower fails to repay the Note by the Maturity Date, Lender may: (i) if the current collateral value of the loan on the Maturity Date is sufficient to collateralize a new loan in the amount equal to the outstanding balance of the mature loan, Lender may provide a new loan on behalf of Borrower in the amount of the outstanding balance of the mature loan, and use the proceeds from the new loan to pay off the mature loan; or (ii) if the current collateral value of a loan at Maturity Date is insufficient to collateralize a new loan, Lender may elect to declare an Event of Default.

(ECF No. 2-1 at 21; ECF No. 16-2 at 14.)

But the language of this provision is permissive: it provides what SmartFi may do if Mr. Song does not pay back his loan, not what it must do. And, as SmartFi argues, Section 5 of the Note requires that Mr. Song repay his loan with U.S. dollars, not with collateral:

> Borrower shall ensure that Borrower's Wallet USD balance is sufficient to cover the entire amount of any loan payment prior to the due date. Lender shall attempt to debit on each applicable payment date Borrower's Wallet to satisfy the amount currently due which may include past due payments and default interest charges. Borrower may at any time make payments via Borrower's Wallet. In the event Borrower's Wallet contains insufficient funds to make a required payment, Borrower authorizes Lender to make an EFT [Electronic Funds Transfer] or ACH

11

[Automatic Clearing House] withdrawal in the payment amount from the bank
account provided by the Borrower.

(ECF No. 2-1 at 20; ECF No. 16-2 at 13.)[10]  The Note therefore allows SmartFi to use Mr.

Song's collateral to repay his loan but does not require this result.  (See also ECF No. 2-1 at 21;

ECF No. 16-2 at 14 ("Further, upon the occurrence or existence of and during the continuance of

any Event of Default, Lender may immediately sell the Collateral." (emphasis added)).)

Mr. Song's second argument is more compelling.  He asserts that SmartFi breached the

provision of the Note which required "Lender to deliver to Borrower sufficient account credit in

BTC necessary to lower the value of the Collateral to the Required Collateral Value" at any time

that "the product of the quantity of Collateral held by Lender multiplied by the closing average

of the past 14 days is greater than 122.5% of the Required Collateral Value…."  (ECF No. 2-1

at 20; ECF No. 16-2 at 13.)  The Required Collateral Value for the note was $6,780,627.95.  (Id.)

As a result, SmartFi was required to return excess collateral to Mr. Song if the value of Mr.

Song's collateral rose above $8,306,269.24, as measured by a 14-day average.  Mr. Song has

alleged that this event occurred before February 2, 2023, and that therefore SmartFi breached the

contract before any breach by Mr. Song due to the failure to repay his loan.

The parties have not provided the court with evidence about the value of Bitcoin at the

time Mr. Song's loan came due, but an approximate value is readily available.  According to the

CME,[11] on January 30, 2023, the value of Bitcoin was $22,967.50 and the average value of the

previous 14 days was $22,464.31.[12]  As a result, the 14-day average value of Mr. Song's

---

[10] The record contains no evidence that SmartFi has attempted to make an EFT or ACH withdrawal of the
outstanding loan balance.

[11] See supra note 7.

[12] The court uses the following values: January 16 – $21,257.50; January 17 – $21,485; January 18 –
$20,800; January 19 – $21,200; January 20 – $22,390; January 21 – $22,390; January 22 – $22,770;
January 23 – $23,090; January 24 – $23,065; January 25 – $22,940; January 26 – $23,075; January 27 –

434 Bitcoin on January 30—the day he repaid $1 million of his loan and was told that SmartFi would not roll over his remaining balance into a new loan—was around $9,750,000, far greater than the $8,306,269.24 benchmark that triggered Mr. Song's right to demand a return of excess collateral.  In these circumstances, the terms of the Note required SmartFi to return enough collateral to drop the value of the remaining collateral to the Required Collateral Value (i.e., $6,780,627.95), not just the higher benchmark value at which point this provision was triggered (i.e., $8,306,269.24).  In other words, on the day SmartFi told Mr. Song he must repay the remaining $3.4 million outstanding on his loan, the contract gave Mr. Song the right to demand a return of collateral worth approximately $3 million.[13]

SmartFi contends that Mr. Song "has not alleged that [he] notified [SmartFi] or requested or exercised such right through the required notice under article 4.9 of the Loan Agreement prior to his own breach on the Maturity Date."  (ECF No. 19 at 5.)[14]  But the court is not persuaded by this argument.  On November 25, 2022, Mr. Song asked SmartFi to adjust the amount of his collateral: "Plz adjust the collateral."  (ECF No. 25-2 at 35.)  Mr. Meecham responded, explaining: "The market price is still very far away from a 14-day average that would result in a return of collateral to you."  (Id. at 36.)  On January 5, 2023, Mr. Song asked if he had received any Bitcoin back after SmartFi refinanced and rolled over his previous loan.  (ECF No. 25-3 at 11.)  Mr. Meecham responded: "The finance team rolled the BTC collateral balance into the new

---

$23,052.70; January 28 – $23,052.80; January 29 – $23,932.50.  The parties have not briefed whether the 14-day average includes non-trading days, but the result is not substantially different.

[13] $9,750,000 – $6,780,627.95.

[14] The Agreement requires that notice be given in writing and states that "Borrower's primary means of notice shall be to submit such notice to Lender through the SmartFi Help Center portal."  (ECF No. 2-1 at 14–15; ECF No. 16-2 at 7–8.)

loan <u>and is watching for when the margin recall is eligible.</u>"  (<u>Id.</u> at 12 (emphasis added).)

Given these facts, the court finds that Mr. Song has plausibly alleged that he notified SmartFi of his demand for the return of excess collateral, that he had the right under the contract to a return of excess collateral of approximately $3 million sometime before his loan came due, and that SmartFi therefore breached the contract by failing to return the excess collateral.

### 2.  Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must allege facts supporting three elements: "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."  <u>Jeff v. Stubbs</u>, 970 P.2d 1234, 1248 (Utah 1998) (citation omitted).

SmartFi first argues that Mr. Song's unjust enrichment claim fails because a valid contract governs the parties' relationship: "[T]hough the parties 'may raise alternative theories on breach of contract and quantum meruit at the pleading stage, once the court has determined that a valid contract govern[s] the parties' relationship, that generally precludes a quantum meruit claim.'"  <u>Northgate Vill. Dev., LC v. Orem City</u>, 325 P.3d 123, 133 (Utah Ct. App. 2014) (citation omitted).  But this action remains at the pleading stage and the court has not yet determined the extent to which the Note and Agreement govern the dispute between the parties. As a result, Mr. Song's breach of contract claim does not preclude him from pleading an unjust enrichment claim in the alternative.[15]

SmartFi maintains that Mr. Song's unjust enrichment claim should nevertheless be

---

[15] Mr. Song also argues that there was no contract because it was not signed, but the court is not persuaded by this argument because the parties have not disputed the essential terms of the contract.

dismissed because the parties bargained for a highly collateralized loan knowing that cryptocurrency was a volatile source of collateral. Because the current high value of Mr. Song's Bitcoin could drop quickly, SmartFi argues there is nothing inequitable about retaining the benefit of Mr. Song's collateral until he repays his loan.

But Mr. Song's unjust enrichment claim is not simply based on the amount of collateral required when the parties agreed upon the loan (i.e., $6.8 million). Instead, Mr. Song cites the value of that collateral at the time of pleading (i.e., over $11 million). (See ECF No. 5 at ¶ 69.) As discussed above, the court finds a question about whether the Note was overcollateralized to begin with (by 434 Bitcoin instead of 405 Bitcoin). And elsewhere in his Counterclaim, Mr. Song has plausibly alleged that SmartFi should have returned some of his collateral before the loan came due.

In addition, the circumstances in which SmartFi retains Mr. Song's collateral are atypical for loan default actions. First, SmartFi already maintains control of Mr. Song's collateral (it has not had to foreclose on that collateral, for instance). Second, SmartFi has refused to exercise a remedy that, while not mandatory, is nevertheless contemplated by the Note—namely, selling the collateral to repay the loan. And finally, the value of the collateral has risen extensively. Even between the hearing on the pending motions and the date of this order, the value of Mr. Song's collateral has risen by around $7 million—over twice the amount of the outstanding balance of $3.4 million.

Although the court has not found a case that is analogous, it would be premature to dismiss Mr. Song's claim for unjust enrichment given these facts. "As we stated in Jeffs, the facts underlying unjust enrichment claims vary greatly from case to case, and the doctrine of unjust enrichment was specifically developed to address situations 'that did not fit within a

particular legal standard but which nonetheless merited judicial intervention.'" Desert Miriah,

Inc. v. B & L Auto, Inc., 12 P.3d 580, 582 (Utah 2000) (quoting Jeffs, 970 P.2d at 1244–45)).

The court therefore denies SmartFi's motion to dismiss Mr. Song's claim for unjust

enrichment.

### 3.   Breach of the Implied Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing inheres in most, if not all, contractual

relationships.  See Beck v. Farmer Ins. Exch., 701 P.2d 795, 798 (Utah 1985).  Under the

covenant of good faith and fair dealing, each party to a contract "impliedly promises that he or

she will not intentionally or purposely do anything to destroy or injure the other party's right to

receive the fruits of the contract." A.I. Transport v. Imperial Premium Fin., Inc., 862 F. Supp.

345, 348 (D. Utah 1994) (citing Bastian v. Cedar Hills Inv. & Land Co., 632 P.2d 818, 821 (Utah

1981)).

And while the implied covenant of good faith and fair dealing may not be construed to

imply "new, independent rights or duties not agreed upon by the parties[,]" Brehany v.

Nordstrom, Inc., 812 P.2d 49, 55 (Utah 1991), a determination of this claim requires the court to

look beyond the express contract terms alone:

> To comply with his obligation to perform a contract in good faith, a party's
> actions must be consistent with the agreed common purpose and the justified
> expectations of the other party.  The purpose, intentions, and expectations of the
> parties should be determined by considering the contract language and the course
> of dealings between and conduct of the parties.

St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 200 (Utah 1991) (citation

omitted).

As discussed above, the Agreement and Note do not require SmartFi to sell Mr. Song's

collateral to repay his loan.  But Mr. Song argues that SmartFi is not exercising that discretion in

a fair and commercially reasonable manner.  See Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc., 889 P.2d 445, 450–51 (Utah Ct. App. 1994).  The court agrees.

SmartFi's refusal to sell Mr. Song's collateral is puzzling.  In the typical loan default case, the defaulting party has defaulted because they do not have sufficient funds to repay the loan—in which case, the lender's only option to recover those funds is through the security provided for the loan.  After all, the purpose of providing collateral for a loan is to ensure the lender has recourse to payment in the event of default.  At this stage of the pleadings, Mr. Song has plausibly alleged that SmartFi did not exercise its discretion in a commercially reasonable manner when it responded to the alleged event of default.

SmartFi's refusal to sell the collateral is especially troubling given the course of dealing between the parties and the representations—that SmartFi would roll over the loan and, later, that it would use his collateral to repay the loan—alleged by Mr. Song.  As discussed below, the court finds that these representations are not sufficient to state a claim for fraud, as Mr. Song was not induced to do anything that he was not under a legal obligation to do anyway.  But these alleged promises are relevant to a determination of the justified expectations of the parties in the context of a claim for the breach of the covenant of good faith and fair dealing.  Mr. Song has plausibly alleged that he expected SmartFi to roll over his loan because that had been the typical course of dealing between the parties.  It is undisputed that SmartFi gave Mr. Song only a few days' notice that it would not continue its previous practices—and that it only did so after Mr. Song had repaid $1 million of his loan, assuming that the remaining balance would roll over.

Given the late notice, the previous course of dealing, and SmartFi's alleged failure to communicate with Mr. Song after it informed him that the full balance of his loan was due, SmartFi's refusal to sell Mr. Song's collateral raises questions about whether it exercised its

discretion under the contract consistent with the common purpose of the agreement and Mr. Song's justified expectations.

Finally, SmartFi argues that Mr. Song cannot maintain a claim for breach of contract, conversion, or trespass to chattel because any return of excess collateral under the Note required Mr. Song to provide notice of that demand. To the extent that Mr. Song is unable to prove that he provided the required notice, he may argue in the alternative that SmartFi's failure to repay the excess collateral was nevertheless a breach of the covenant of good faith and fair dealing.

The court therefore denies SmartFi's motion to dismiss this claim.

### 4. Fraud

To prove a claim of fraudulent inducement[16] under Utah law, a plaintiff must show

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

Daines v. Vincent, 190 P.3d 1269, 1279 (Utah 2008) (citation omitted).

Mr. Song asserts two instances in which he relied to his detriment on SmartFi's promises. First, he maintains that he repaid $1 million of his loan balance on the representation that SmartFi would roll over the remaining balance into a new loan. (ECF No. 5 at ¶ 27; Def.'s Resp., ECF No. 17 at 13.) Second, he argues that he was induced to wait to pay off his loan due to SmartFi's promise to sell his collateral and that, as a result,

---

[16] Mr. Song brings his claim broadly as a fraud claim but more specifically alleges that he was fraudulently induced to wait to pay off his loan. See ECF No. 5 at ¶ 82.

he was unable to avoid default.  (ECF No. 5 at ¶¶ 80–82.)

The court is not persuaded that either of these instances is evidence of detrimental reliance.  Although Mr. Song asserts that he only repaid the $1 million on SmartFi's representation that they would roll over his loan, he does not dispute that he was under a contractual duty to repay the entire $4.4 million loan by February 2, 2023.  Mr. Song has not explained how repaying a quarter of this balance three days early caused him to incur additional debt—only that Mr. Song would have kept the $1 million had he known differently.  The court finds no detrimental reliance where Mr. Song's repayment was a partial performance of an outstanding legal obligation.

Similarly, SmartFi's refusal to sell Mr. Song's collateral to repay his loan did not prevent Mr. Song from curing his default by paying off the remaining balance of his loan in U.S. dollars, as contemplated by the parties' contract.  (See ECF No. 2-1 at 20; ECF No. 16-2 at 13.)  Mr. Song has not pled facts explaining how he would have otherwise avoided default had SmartFi said nothing about selling his collateral (or rolling over his loan).  Taking the alleged facts as true, Mr. Song's reticence to repay his loan without additional assurances that SmartFi would return his collateral is understandable.  But Mr. Song has not alleged that SmartFi refuses to accept repayment of his loan with cash— indeed, SmartFi asks the court to order that result in this lawsuit.  Because Mr. Song holds the key to curing his default, the court finds that SmartFi's representations did not cause Mr. Song detrimental reliance.

The court therefore dismisses Mr. Song's claim for fraud.

**5.  Conversion**

"A conversion is an act of willful interference with a chattel, done without lawful

justification by which the person entitled thereto is deprived of its use and possession."
Fibro Trust, Inc. v. Brahman Fin., Inc., 974 P.2d 288, 295–96 (Utah 1999).  A basic
requirement of conversion is "[t]hat there be a wrongful exercise of control over personal
property in violation of the rights of its owner."  Frisco Joes, Inc. v. Peay, 558 P.2d 1327,
1330 (Utah 1977).

Mr. Song asserts that SmartFi has wrongfully exercised control over his collateral.
SmartFi argues that its control cannot be wrongful because Mr. Song has failed to repay
the loan in full and is therefore not entitled to current lawful possession of the collateral.
See Benton v. State, 709 P.2d 362, 365 (Utah 1985) ("An interest in the property which
does not carry with it a right to possession is not sufficient; the right to maintain the
action may not be based upon a right to possession at a future time." (emphasis
removed)).

But the Note provides that SmartFi must return collateral in excess of the
Required Collateral Value once the value of that collateral exceeds 122.5% of the
Required Collateral Value, as measured by a 14-day average.  As previously discussed,
the court finds that Mr. Song has plausibly alleged that he gave notice to SmartFi of his
demand for SmartFi to return the excess collateral, that the value of the collateral
exceeded the contractual benchmark by the end of January 2023, and that SmartFi was
therefore required to return some of the excess collateral on a date before Mr. Song's loan
came due.  Given these facts, Mr. Song has alleged a current—and not merely a future—
right to possession.

Accordingly, the court denies SmartFi's motion to dismiss this claim.

### 6.  Equitable Recoupment and Setoff

Under Utah law, "a setoff is merely a counterclaim which a defendant may have against a plaintiff to be used in full or partial satisfaction of whatever is owed." Bichler v. DEI Sys., Inc., 220 P.3d 1203, 1208 (Utah 2009) (cleaned up).  To determine whether Mr. Song may assert an equitable right of setoff, the court must determine whether he has alleged a cognizable counterclaim against SmartFi.  See id.  Because the court has determined that Mr. Song has alleged several cognizable counterclaims, it denies SmartFi's motion to dismiss Mr. Song's assertion of equitable setoff.

SmartFi also argues that any setoff is waived by the terms of the Note, which states: "Borrower is not entitled to set off any amount owed by Lender to Borrower against any amount owed under this Note."  (ECF No. 2-1 at 22; ECF No. 16-2 at 15.) But the Utah Supreme Court has previously allowed a claim of equitable setoff even where there was no contractual right to setoff.  Bichler, 220 P.3d at 1207 ("DEI argues that even if its claim of setoff is not based in contract, it nonetheless has an equitable right of setoff.  We agree.").  The doctrine of setoff "is essentially an equitable one requiring that the demands of mutually indebted parties be set off against each other and that only the balance be recovered in a judicial proceeding by one party against another." Id. (citation omitted).  Mr. Song's right to setoff "rests upon the inherent power of a court to do justice to the parties before it."  Id. (citation omitted).

Mr. Song may therefore continue to assert the equitable right of setoff.

### 7.  Trespass to Chattel

Under Utah law, trespass to chattel occurs when "one intentionally (a) dispossesses another of the chattel, or (b) uses or intermeddles with a chattel in the possession of another."

Nassi v. Hatsis, 525 P.3d 117, 122 (Utah Ct. App. 2023) (cleaned up).  As SmartFi recognizes (see Pl.'s Mot. Dismiss, ECF No. 11 at 6), "the difference between trespass to chattels and conversion is immaterial where there is a wrongful taking and carrying away of the property of another" and there is "no need to treat the trespass to chattels and conversion claims separately." Nassi, 525 P.3d at 122 n.10.

Accordingly, for the reasons stated above denying SmartFi's motion to dismiss Mr. Song's claim for conversion, the court also denies the motion to dismiss Mr. Song's claim for trespass to chattel.

## B.  Preliminary Injunction

Mr. Song seeks a preliminary injunction that either 1) orders SmartFi to sell a portion of Mr. Song's collateral sufficient to satisfy the repayment due under the contract; or 2) orders both parties to place the disputed amounts—the outstanding balance of the loan for Mr. Song and the full collateral for SmartFi—in an escrow account in the court's registry or with a third party. (See Def.'s Mot. Prelim. Inj., ECF No. 16 at 20.)

Before analyzing the preliminary injunction factors, the court notes that Mr. Song's first proposal essentially provides him all the relief he seeks from a fully litigated judgment on the merits.  Such an injunction is disfavored.  See O Centro Espirita Beneficiente Uniao do Vegetal, 389 F.3d at 975.

Mr. Song's second proposal presents several challenges.  First, the court cannot receive cryptocurrency in its registry, and it is unclear whether and how a third party could serve as an agent holding cryptocurrency in escrow for the court.  But an order to provide these funds in U.S. dollars could create unintended tax consequences that have not been fully briefed.  Finally, this proposal would order SmartFi to place into escrow not only the excess collateral, but also the

$3.4 million that Mr. Song concedes is still owed on the loan.  Such an injunction could have the effect of over-penalizing SmartFi before a final decision on the merits.

For these reasons, the court prefers Mr. Song's first proposal and must therefore carefully scrutinize the four factors: 1) likelihood of success on the merits; 2) irreparable injury; 3) balance of harms; and 4) public interest.  See Utah Licensed Beverage Ass'n, 256 F.3d at 1065–66.

### 1.  Likelihood of Success on the Merits

The court finds that there is a substantial likelihood that Mr. Song will succeed on the merits of one or more of his claims for breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.  For the reasons discussed above, Mr. Song has stated several plausible claims for relief.  Although he asserts various and sometimes alternative theories of liability, his arguments generally center on one fundamental issue: Mr. Song argues, and the court agrees, that SmartFi has failed to provide a reasonable explanation of why it refuses to repay the remaining balance of his loan by selling a portion of Mr. Song's collateral. While the Agreement and Note may not require this result, the course of dealing between the parties, the specific representations made to Mr. Song, and reasonable business practice are all factors suggesting that SmartFi must satisfy Mr. Song's loan obligations by using the collateral that it has in its possession.  As the court has noted, this remedy would be SmartFi's only available means for relief if Mr. Song were insolvent, and there would be no justification for SmartFi to delay repayment or to retain the value of Mr. Song's collateral beyond what was needed to repay the loan.

Although the court has found few cases on point, a district court in California decided a motion to dismiss in favor of the owner of Bitcoin collateral in a dispute involving a lender who preferred to retain the cryptocurrency (which had increased in value) rather than allow the

borrower to repay his loan.  See Alvi v. Eads, No. 2:22-cv-500-KJM-DB, 2022 WL 2239266 (E.D. Cal. June 22, 2022).  The court found that "it [was] plausible to infer that [the borrower] could prove at trial that his performance was excused" given that the lender refused to accept repayment.[17]  Id. at *4.

In addition, Mr. Song has provided evidence indicating that the loan may have been over-collateralized to begin with, that the terms of the Note required SmartFi to return a significant amount of that collateral before the loan came due, and that it is a form of unjust enrichment for SmartFi to continue to hold Mr. Song's collateral when its value has increased so significantly.

Most importantly, the court finds that Mr. Song has shown a substantial likelihood of success on his assertion of the equitable right of setoff.  Even if the court finds for SmartFi on its breach of contract claim and against Mr. Song on all his counterclaims, the judgment for damages will likely be the same (other than potential differences in the awards for interest, attorney's fees, and costs).  The court will set off the outstanding loan balance of $3.4 million that Mr. Song owes SmartFi—and which SmartFi may claim as damages for Mr. Song's breach of contract—against the value of the collateral that SmartFi must return to Mr. Song, as required under the contract and as a matter of equity.   Therefore, unless the value of Bitcoin drops substantially, the judgment award will be in favor of Mr. Song.

SmartFi does not dispute that it must return the collateral eventually, but insists that, under the terms of the Agreement and Note, Mr. Song must first repay the loan balance in U.S. dollars.  Essentially, SmartFi is asking for specific performance of the contract.  But specific performance is a remedy reserved for actions in which monetary damages are not

---

[17] The court did not discuss whether the borrower attempted to repay his loan in U.S. dollars or by asking the borrower to sell off part of the collateral.

sufficient—for instance, because the disputed matter involves real property.  See <u>SMS Fin., LLC v. CBC Fin. Corp.</u>, 417 P.3d 70, 75 (Utah 2017) ("Specific performance … is only appropriate where damages are inadequate and equitable relief will result in more perfect and complete justice." (citation omitted)).  SmartFi itself admits that Bitocin is extremely fungible and can be treated as cash.  (Pl.'s Mem. Opp'n, ECF No. 18 at 2 ("The Collateral Bitcoin is [a] fungible, completely ordinary financial means of exchange" and is "not an irreplaceable or unique item [of] land or an endangered species.").)  Nevertheless, SmartFi's counsel stated at the hearing that it could not return the Bitcoin without "unwind[ing] its own hedges," an argument that treats Bitcoin more like real property than liquid currency.  SmartFi has presented the court with a kind of Schrödinger's cash: until the court issues an order, Mr. Song's collateral is both a fungible, easily convertible currency but also the type of collateral for which specific performance of the contract is required.

While the court is willing to entertain further argument on this issue, SmartFi has not yet presented the court with a convincing reason why monetary damages are insufficient to resolve the dispute between the parties.  As a result, Mr. Song is substantially likely to receive a judgment in his favor—with only adjustments concerning the proper amount of interest, costs, and attorney's fees still to be decided.

Given these reasons, the court finds that Mr. Song has shown a substantial likelihood of success on the merits.

### 2.  Irreparable Harm

"The purpose of a preliminary injunction is not to remedy past harm but to protect [movants] from irreparable injury that will surely result without their issuance.  The movant must demonstrate a significant risk that he or she will experience harm that cannot be compensated

after the fact by money damages." Kodiak Cakes LLC v. Cont'l Mills, Inc., 358 F. Supp. 3d

1219, 1236 (D. Utah 2019) (citing DTC Energy Grp., Inc. v. Hirschfeld, 912 F.3d 1263, 1270

(10th Cir. 2018)).  It is "well settled that simple economic loss usually does not, in and of itself,

constitute irreparable harm; such losses are compensable by monetary damages." Schrier v.

Univ. of Colo., 427 F.3d 1253, 1267 (10th Cir. 2005) (citation omitted).

   Mr. Song seeks monetary damages from SmartFi (or the return of his Bitcoin, which is a

form of monetary damages in another currency) in the amount of the value of his collateral

minus the outstanding balance owed on his loan.  He must therefore demonstrate why he cannot

be fully compensated after a complete litigation of this matter on the merits.

   Mr. Song cites three pieces of evidence for the proposition that SmartFi is not financially

stable.  First, he notes the volatility in the cryptocurrency market in the past year and the number

of lenders like FTX that have become defunct.  (ECF No. 16 at 17.)  Second, he points to the

facts in this case, especially SmartFi's refusal to roll over his loan, return any excess collateral,

or use his collateral to repay the remaining balance.  (Id.)  Finally, he points to a separate lawsuit

against SmartFi in which investors have alleged that SmartFi failed to honor the guarantees it

made concerning tokens it issued to those investors.  See Compl., Brown v. Power Block Coin,

LLC, No. 2:23-cv-554, ECF No. 1 (W.D. Pa. Apr. 3, 2023).  Taking this evidence together, Mr.

Song argues that SmartFi is on the brink of insolvency and that he will therefore face irreparable

harm absent an immediate injunction ordering SmartFi to return part or all of his collateral.

   The court is not persuaded that this evidence amounts to anything more than conjecture.

Although SmartFi's decisions concerning Mr. Song's loan raise questions, the court cannot find

on the current record convincing evidence that the lending platform is on the verge of collapse.

See United States v. Brown, 331 F.2d 362, 365 (10th Cir. 1964) (affirming the district court's

decision to deny a request for a preliminary injunction where the movant could not "show[] that appellee is or may become insolvent"). And to the extent that SmartFi has already dissipated Mr. Song's collateral, an injunction will not provide Mr. Song any greater relief than a decision on the merits.

The court therefore finds that Mr. Song has not demonstrated that he will be irreparably harmed absent an injunction. Mr. Song is welcome to provide additional evidence to the court if he discovers other indications that SmartFi is about to become insolvent.

### 3. Balance of Harm

Mr. Song argues that the harm he would suffer in the absence of a preliminary injunction outweighs any harm the injunction would cause SmartFi because he is at risk of losing several million dollars in collateral, whereas the collateral is not SmartFi's to begin with—and therefore an order placing this collateral in escrow or demanding its return would not harm SmartFi.

Frankly, the court does not know what to make of this factor on the record before it. The Agreement signed by the parties does not appear to contain restrictions on SmartFi's use of Mr. Song's collateral. While the Agreement states that "Borrower is the sole owner of the Collateral and has good and marketable title thereto" (ECF No. 2-1 at 10; ECF No. 16-2 at 3), this provision is a representation and warranty that Mr. Song made to SmartFi under the Agreement, not a restriction on SmartFi's subsequent use of the collateral.

At the hearing, SmartFi's counsel argued that SmartFi required a cash payment of Mr. Song's remaining loan balance in order to "unwind its own hedges" and return Mr. Song's Bitcoin. The court fails to see how SmartFi needs $3.4 million in cash in order to return several times that amount of a fungible currency. Nevertheless, the court is unable to ascertain the extent of harm that could be caused to SmartFi if the court were to order the immediate return or

the placement into escrow of Mr. Song's collateral.

The court therefore finds that this factor is equivocal.

### 4.  Public Interest

Finally, the court finds that Mr. Song fails to "demonstrate that issuance of the preliminary injunction is not adverse to the public interest." Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 357 (10th Cir. 1986).  A preliminary injunction is contrary to the public interest if it overrides the express terms of the parties' contract.  See Peterson & Simpson v. IHC Health Servs., Inc., 217 P.3d 716, 720 (Utah 2009) (indicating that "parties are free to structure their agreement in any manner they desire" and that courts should "respect the parties' freedom to contract").  And while the court finds that Mr. Song has demonstrated a likelihood of success on one or more of his claims, there remains a highly contested dispute about the proper interpretation of the parties' contract.

Given the unique facts of this case and the absence of helpful precedent, the court finds that the public interest is favored by a decision on the merits after the parties have had discovery and a chance to fully argue their positions.

### 5.  Conclusion

Although Mr. Song has shown a substantial likelihood of success on the merits, he has not demonstrated that he will be irreparably harmed absent a preliminary injunction. Furthermore, consideration of the balance of harms and the public interest provides equivocal support for Mr. Song's motion at best.  The court therefore declines to issue a preliminary injunction.

The court's decision is without prejudice, and the court is willing to entertain a renewed motion if Mr. Song can present more compelling evidence that SmartFi is on the verge of

insolvency.  The court prefers, however, to issue a decision on the merits after the benefit of discovery.  The court notes that discovery is not likely to be extensive in this case and that therefore the parties are welcome to propose an expedited deadline for dispositive motions.

## ORDER

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART SmartFi's Motion to Dismiss Defendant's Counterclaims (ECF No. 11).  The court dismisses Mr. Song's claim for fraud but allows him to proceed on his remaining claims.  The court DENIES WITHOUT PREJUDICE Mr. Song's Motion for Preliminary Injunction (ECF No. 16).

SO ORDERED this 5th day of December, 2023.

BY THE COURT:

Tena Campbell
United States District Judge